UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| SANDEE'S CATERING, | No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| AGRI STATS, INC., BUTTERBALL LLC, CARGILL, INC., CARGILL MEAT SOLUTIONS CORPORATION, COOPER FARMS, INC., FARBEST FOODS, INC., FOSTER FARMS, LLC, FOSTER POULTRY FARMS, THE HILLSHIRE BRANDS COMPANY, HORMEL FOODS CORPORATION, HORMEL FOODS, LLC, HOUSE OF RAEFORD FARMS, INC., KRAFT HEINZ FOODS COMPANY, KRAFT FOODS GROUP BRANDS LLC, PERDUE FARMS, INC., PERDUE FOODS LLC, TYSON FOODS, INC., TYSON FRESH MEATS, INC. AND TYSON PREPARED FOODS, INC., | DEMAND FOR JURY TRIAL |
| Defendants. | |

## TABLE OF CONTENTS

**Page**

I.    NATURE OF ACTION ................................................................................1

II.   JURISDICTION AND VENUE ...............................................................13

III.  PARTIES ..................................................................................................14

    A.    Plaintiff ...........................................................................................14

    B.    Defendants .......................................................................................15

    C.    Co-Conspirators ..............................................................................19

IV.   FACTUAL ALLEGATIONS ...................................................................20

    A.    Agri Stats' information exchange services began in the broiler
        industry, where it has been used to facilitate widespread collusion. ...................20

    B.    Defendants entered into an agreement to exchange information
        through Agri Stats regarding their production and sales of turkey. ......................23

    C.    Defendants possess market power in the market for turkey and
        turkey is the type of product for which information exchange is
        particularly likely to have anticompetitive effects. .................................................27

        1.    Defendants have market power in the market for turkey. ..........................27

        2.    There are high barriers to entry in the market for turkey for
            meat consumption. ....................................................................................28

        3.    The defendants have market power in the market for turkey
            for meat consumption. ...............................................................................29

    D.    The market for turkey is the type of market where the information
        exchanges orchestrated by Agri Stats are likely to harm competition. .................30

        1.    The turkey market features few sellers. ....................................................31

        2.    Turkey is a fungible market. .....................................................................31

        3.    The turkey market features price-based competition. ...............................31

        4.    Demand for turkey is relatively inelastic. ................................................32

        5.    The turkey market features a trend towards price uniformity...................32

E.    Industry-wide production cuts during the Conspiracy Period were facilitated through the information exchange conducted through Agri Stats. ....................................................................................32

F.    Abnormal pricing during the Class Period demonstrates the anticompetitive effects of the exchange of turkey information conducted through the Agri Stats sales reports..........................................33

    1.    The average turkey wholesale price experienced an unprecedented increase beginning in 2009. ...............................33

    2.    Beginning in 2009, defendants' revenues radically diverged from their costs. ...........................................................34

    3.    During the conspiracy period, prices rose but production failed to rise to match demand, indicating an anticompetitive restraint on supply in the market for turkey facilitated by the information exchange through Agri Stats. ..................................36

    4.    During the conspiracy period, prices of turkey radically diverged from the costs of underlying feed. ...............................37

    5.    A regression model demonstrates the anticompetitive effects on the price of turkey caused by the information exchange conducted through Agri Stats........................................38

G.    Defendants actively concealed the extent of their information exchange and plaintiff did not and could not have discovered defendants' anticompetitive conduct. ..................................39

H.    Defendants had numerous opportunities to collude.............................41

V.    CLASS ACTION ALLEGATIONS ..................................................42

VI.   ANTITRUST INJURY .................................................................46

VII.  CAUSES OF ACTION ................................................................47

VIII. REQUEST FOR RELIEF .............................................................79

IX.   JURY TRIAL DEMANDED .........................................................81

Plaintiff brings this action on behalf of itself individually and on behalf of a plaintiff class consisting of all commercial and institutional indirect purchasers of turkey that purchased turkey other than directly from a defendant or co-conspirator in the United States beginning at least as early as January 1, 2010 through January 1, 2017 (Class Period).[1] Plaintiff brings this action for damages, injunctive relief, and other relief pursuant to various federal and state antitrust laws and state unfair competition laws and unjust enrichment laws. Plaintiff demands a trial by jury.

## I.    NATURE OF ACTION

1.    The turkey integrator defendants are the leading suppliers of turkey in an industry with approximately $5 billion in annual commerce. The turkey industry is highly concentrated, with a small number of large producers in the United States controlling supply. Defendants and their co-conspirators collectively control approximately 80 percent of the wholesale turkey market in the United States. The turkey integrator defendants are Butterball LLC (Butterball); Cargill Inc. and Cargill Meat Solutions Corporation, (together and separately, Cargill); Cooper Farms, Inc. (Cooper Farms); Farbest Foods, Inc., (Farbest); Foster Farms LLC and Foster Poultry Farms (together and separately, Foster Farms); Hormel Foods Corporation and Hormel Foods LLC (together and separately, Hormel); House of Raeford Farms, Inc., (House of Raeford); Kraft Heinz Foods Company and Kraft Foods Group Brands LLC (together and separately, Kraft Foods), Perdue Farms, Inc. and Perdue Foods LLC (together and separately, Perdue); Tyson Foods, Inc., The Hillshire Brands Company, Tyson Fresh Meats, Inc. and Tyson Prepared Foods, Inc. (together and separately, Tyson).

---

[1] For purposes of this complaint, turkey includes turkey meat purchased fresh or frozen, and either uncooked or cooked.

2.     Defendant Agri Stats is a company that provides secretive information exchange services to companies in a variety of agricultural sectors, including pork, chicken, and turkey.

3.     The turkey integrator defendants each entered into an agreement from at least 2010 to January 1, 2017, to exchange sensitive information through Agri Stats regarding their production and sales of turkey.

4.     Agri Stats reports are far different from lawful industry reports. Agri Stats gathers detailed financial and production data from each of the turkey integrators, standardizes this information, and produces customized reports and graphs for the co-conspirators. On a monthly basis, Agri Stats provides the turkey integrators with current and forward-looking sensitive information (such as profits, costs, prices and slaughter information).

5.     The United States Supreme Court has long recognized that "exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects."[2] Agri Stats' sales reports prove the truth of that maxim. Agri Stats prepared monthly reports for defendants regarding their sales of turkey that identified, on a specific product by product level, the prices and returns that each defendant was obtaining on their sales of turkey. These reports, unavailable to anybody besides Agri Stats subscribers, allowed the integrator defendants to easily identify potential opportunities where their prices for turkey products were significantly lower than their competitors.

6.     Turkey is the relevant product market and the geographic market is the continental United States. Defendants collectively possess market power in the market for turkey. Defendants and co-conspirators collectively possessed approximately 80 percent of the overall market share for turkeys during the Class Period.

---

[2] *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 (1978).

7.     Blair Snyder, a senior executive at Agri Stats, publicly stated in 2009 that "about 95% of the turkey industry [is] participating" in Agri Stats, and that for "turkey participants, pretty much it's a list of who's who in the turkey business." This is a comparable portion to the percentage of broiler chicken industry participating in Agri Stats reports, with Mr. Snyder stating that "we've got high 90 percentage of both broilers and turkeys."

8.     Each one of the defendants and co-conspirators entered into an agreement to exchange information through Agri Stats. Each defendant's agreement to exchange information regarding turkey production is shown in the below 2010 excerpt from an Agri Stats presentation that lists the participants in Agri Stats' turkey reports.



9.     This 2010 presentation slide shows that each of the defendant integrator and Co-Conspirator Integrators entered into an agreement to exchange information regarding their turkey operations through Agri Stats during the conspiracy period. The document directly identifies

3

defendants Butterball, Cargill, Cooper's, Farbest, Foster Farms, House of Raeford and Perdue Farms, as participants in Agri Stats's reports on turkey. The document directly identifies Co-Conspirators Circle-S Ranch, Prestage Farms, and West Liberty Foods as participants in Agri Stats' reports on turkey. Jennie-O is the brand name for Hormel's turkey operations and thus Hormel participated in Agri Stats' reports on turkey. The document also identifies Louis Rich, a Kraft Foods brand that produces turkey, as receiving Agri Stats reports, and thus Kraft Foods participated in Agri Stats' reports on turkey. Sara Lee's turkey operations, Hillshire Brands, was subsequently acquired by Tyson in 2014 and thus Tyson participated in Agri Stats' reports on turkey.

10.     The information exchange by the defendant integrators through Agri Stats is exactly the type of information exchange that the Supreme Court has recognized is likely to have anticompetitive effects under a rule of reason analysis. First, the data is current and forward-looking – which courts consistently hold has "the greatest potential for generating anticompetitive effects."[3] Second, information contained in Agri Stats reports is specific to the turkey producers, including information on profits, prices, costs and production levels. Third, none of the Agri Stats information was publicly available. Agri Stats is a subscription service, which required the defendant integrators to pay hefty fees over the Class Period – far in excess of any other pricing and production indices and to agree to volunteer their own data. "Public dissemination is a primary way for data exchange to realize its pro-competitive potential."[4] Agri Stats ensured that its detailed, sensitive business information was available only to the co-conspirators and not to any buyers in the market. Thus, for example, buyers on the market could

---

[3] *Todd v. Exxon Corp.*, 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

[4] *Id.* at 213.

not use Agri Stats data in Agri Stats sales reports to negotiate lower prices; instead, only defendants could use it as a way to identify opportunities to raise their prices.

11.     Indeed, Agri Stats specifically marketed itself to potential participants as a way that they could "improve profitability" rather than engage in competition through production increases. Agri Stats was good to its word; its sales reports specifically identified opportunities for defendants where defendants' products were lower than that of the industry average and where defendants could consequently raise prices to meet that of their competitors.

12.     Industry participants relied on Agri Stats reports in their analysis of their business operations. For example, Hormel, at its 2011 Investor Day, stated in its presentation that "when you optimize the supply chain" you "improve your relative industry position (Agri Stats)." Hormel also touted that "Jennie-O Turkey Store is consistently one of the top companies in operating profits (Agri Stats)."

13.     Confidential Witness 1 (CW1) is a former sales executive at Butterball involved in the pricing of turkeys. CW1 was employed at Butterball during the entire Class Period. CW1 stated that Butterball relied on the monthly reports issued by Agri Stats: "The company used the information to evaluate — by item, item group, price, distribution — where we stood against other turkey companies." CW1 stated that he and other sales personnel looked at Agri Stats data to see how Butterball ranked against peers in the turkey industry. CW1 stated that he personally looked at the Agri Stats data to assess costs and returns. CW1 stated that costs were an important factor in determining how Butterball set its prices.

14.     Confidential Witness 2 (CW2) is a former accountant at Cooper Farms. CW2 stated that Cooper Farms received monthly reports from Agri Stats. In addition, Agri Stats representatives met with Cooper Farms executives every six months. CW2 stated that Cooper

Farms submitted cost information to Agri Stats every month. CW2 explained that Agri Stats reports grouped data into various types of turkey products, including deli meat and smoked meat.

15.     CW2 stated that Agri Stats representatives regularly met with the Cooper Leadership Management Group, which included top management and executives from Cooper Farms. CW2 stated that "the upper group received advice" from Agri Stats. CW2 stated that the advice from Agri Stats helped Cooper Farms improve its returns per pound.

16.     Agri Stats reports also contained detailed information on industry-wide supply levels. For example, a job description of an Agri Stats employee stated that they analyzed Turkey "breeder flock and hatchery data" as well as Turkey "growout flocks."

17.     Based on publicly available information filed in a February 7, 2018, complaint in the *Broiler Chicken Antitrust Litigation*,[5] Agri Stats data on growout flocks contained information such as the number of broilers placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (aka, "down time"), feed conversion rate (pounds of feed per pound of broiler), and average daily weight. On information and belief, the growout data that Agri Stats compiled for the turkey industry contained similar levels of data. This type of data allowed defendants to monitor industry-wide supply levels.

18.     Although Agri Stats reports are nominally anonymous, defendant integrators were often able to deanonymize the reports to identify the data of specific companies based on their industry knowledge. CW2 stated that he could determine the identity of companies in Agri Stats reports because "you could usually figure out who was who because they have a certain cooked

---

[5] *In re Broiler Chicken Antitrust Litigation*, Case No. 1:16-cv-08637 (N.D. Ill.) (ECF No. 710)

meat, or if they were browning and running it through an oven." CW2 further stated that "we could sit there and discuss it, because a lot of us knew what the other plants in the big areas, what they did." For example, CW2 stated that one competitor company had five separate facilities included in the Agri Stats reports, and that therefore, it was easy to determine the identity of that company.

19.    Confidential Witness 3 (CW3) is a former employee of Cargill during the conspiracy period. CW3 stated that Cargill received monthly reports from Agri Stats on turkey. CW3 stated that the monthly Agri Stats turkey reports went directly to Cargill finance executives.

20.    Throughout the conspiracy period, defendant integrators were able to exercise a remarkable level of industry-wide restraint in keeping the growth of turkey supply in check, causing turkey prices to rise. Thus, Agri Stats had the anticompetitive effect of allowing defendants to engage in collusion to restrain the supply of turkey by facilitating information exchange about supply levels throughout the industry. The industry-wide cuts in turkey production during the conspiracy period are shown in the following chart:



21.     In a competitive market, production generally matches demand. More demand will lead to more supply. Conversely, a drop in production caused by falling demand should correspond to falling prices. However, in the turkey market during the conspiracy period, production, measured through USDA data, remained artificially restrained even as demand, captured by higher per capita expenditures on turkey, rose significantly. These observed price and output dynamics, shown in the below analysis performed by experts, indicate that it was not falling demand that caused a decline in supply during the conspiracy period.



22.     In addition to their participation in Agri Stats, defendant integrators had frequent opportunities to communicate, in conjunction with formal meetings of various trade associations. In particular, the National Turkey Federation each year held regular meetings, including the NTF Annual Convention and the NTF Leadership conference, which were widely attended by the defendant integrators. CW3 stated that senior Cargill executives, including Cargill's CEO and CFO, attended National Turkey Federation meetings. For example, CW2 stated that Cooper

Farms leadership were involved in the National Turkey Federation, for example Cooper Farms COO Gary Cooper served as immediate past chairman of the NTF board in 2014.

23. Collectively, Hormel, Cargill, and Butterball control approximately 50 percent of the turkey market. Hormel is the only publicly traded company among these three. In its earnings calls during the conspiracy period, Hormel repeatedly discussed the industry-wide success in executing production cuts and maintaining industry-wide production discipline during the Class Period.

24. On June 2, 2009, Hormel emphasized that it was making production cuts in response to an alleged oversupply in the market and closely monitoring the overall level of production in the market, showing the importance of the kind of information exchanged through Agri Stats:

> There is an oversupply of turkey. There continues to be perhaps more production as well as cold storage stocks than the demand would warrant. We have been very deliberate about making the appropriate production cuts. We announced them over a year ago. And we have even exceeded the amount we expected to reduce. We have seen the placements and indicators of forward looking supply come down, so that was as expected, and we expected the second half of 2009 to be a little kinder in the turkey side of the business, but there is still a lot of storage, cold storage stocks to go through, we feel comfortable that we've cleaned up our inventories that we had on hand. Our production cuts were more than the decrease in our sales because we did work off inventories. I had a feeling the industry will rebound. It's going to take a work through of the excess inventories as well as those production cuts hitting the marketplace.

25. On August 20, 2010, Hormel stated, "We think the turkey business has reached a good equilibrium, and we don't have any major expansion plans and have not heard others in that mode, so I think those conditions should remain favorable into next year."

26. On May 25, 2011, Hormel stated that the turkey industry was maintaining solid pricing based on the information that Hormel was receiving about industry-wide turkey

production levels: "We certainly see egg set and poultry placement numbers that take us through the end of this year and a little bit into next fiscal year. But right now, on the basis of those numbers, on the basis of what we see in terms of production in the industry and on the basis of cold storage numbers, coupled with still strong demand on the export side, we feel that the amount of product going to market will support solid pricing on a commodity basis."

27.     On August 25, 2011, Hormel stated that the turkey industry was maintaining better discipline than the poultry industry: "The industry as a whole has shown a little better discipline, perhaps, than the other poultry side of the ledger." This statement is notable because the chicken industry is currently the subject of multiple civil lawsuits as well as a DOJ investigation of potential antitrust violations during this period of time.

28.     Furthermore, the turkey market has all of the characteristics of a market where information exchange is likely to have anticompetitive effects. Turkey is a fungible product, the market for turkey has price-based competition, the demand for turkey is relatively inelastic, and the turkey market features a trend towards price uniformity.

29.     The information exchange through Agri Stats did not have the kind of characteristics that would produce procompetitive effects sufficient to outweigh the anticompetitive harms. The information exchange involved current and forward-looking data. Agri Stats regularly prepared monthly reports that contained data that was less than six weeks old. Agri Stats also only allowed companies to access the data if they themselves shared the data, thus ensuring that only defendants and other similarly situated turkey integrators who received the Agri Stats reports were able to use the data.



30.     During the conspiracy period, the price of turkey spiked dramatically, driven by the anticompetitive effects of the information exchange through Agri Stats regarding turkey production that helped facilitate defendants' restraint over the growth in the supply of turkey.

31.     The information exchange through Agri Stats in fact had anticompetitive effects on the market. Prior to the conspiracy, turkey prices closely tracked the underlying cost of feed, which is the primary input cost in the production of turkey. Beginning in 2009-2010, prices of turkey spiked to an unprecedented level, showing the anticompetitive effects of defendants' information exchange through Agri Stats. Remarkably, as demonstrated in the analysis performed by experts, shown in the below chart, prices of turkey quickly returned to match underlying feed costs after litigation was filed in late 2016 in the broiler industry that centered on the anticompetitive use of Agri Stats. Defendants clearly changed their behavior after the commencement of the Broilers litigation, as Tyson dismissed their CEO, Donnie Smith, in late 2016, shortly after the first civil lawsuits were filed.



32.     Feed accounts for approximately 60-70% of the cost of raising a turkey. Experts constructed a regression model based on the underlying feed cost that models what the "but for" price of turkey would have been if the historical relationship between feed and turkey costs had continued during the conspiracy period. The model demonstrates that the anticompetitive information exchange of data regarding turkey production through Agri Stats caused anticompetitive effects in the market for turkey.



33.    As a result of defendants' unlawful conduct, plaintiff and the Classes paid artificially inflated prices for turkey during the Class Period. Such prices exceeded the amount they would have paid if the price for turkey had been determined by a competitive market. Thus, plaintiff and class members were injured by defendants' agreement to exchange information through Agri Stats regarding the turkey market.

## II.    JURISDICTION AND VENUE

34.    This Court has subject matter jurisdiction over the claims asserted in this litigation under 28 U.S.C. § 1332 because the amount in controversy for each of the Classes exceeds $5,000,000, there are more than 100 members in each of the Classes, and there are members of each of the Classes who are citizens of different states than Defendants. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because plaintiff is bringing a claim for injunctive relief under federal law.

35.    Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because both Kraft Foods and Hillshire Brands are headquartered in the District, and one or more

defendants transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

36. This Court has personal jurisdiction over each defendant because, inter alia, each defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of turkey throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

37. The activities of the defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

### III. PARTIES

**A. Plaintiff**

38. Plaintiff Sandee's Catering is a bakery and deli located in Jamestown, New York. During the Class Period, Plaintiff purchased turkey in New York, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of turkey. The turkey purchased by Plaintiff was impacted by the conduct of one or more of the Defendants, constituting an antitrust violation as alleged herein, and plaintiff suffered monetary loss as a result of the antitrust violations alleged herein.

**B.      Defendants**

39.      Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana. Throughout the Class Period, Agri Stats acted as a co-conspirator of the turkey integrator defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among defendants and their co-conspirators.

40.      Butterball, LLC is a privately held North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Butterball and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

41.      Cargill, Inc. is a privately held Delaware corporation headquartered in Minnetonka, Minnesota. During the Class Period, Cargill and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

42.      Cargill Meat Solutions Corporation is a Delaware corporation that operates as a subsidiary of Cargill, Incorporated. During the Class Period, Cargill Meat Solutions and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

43.      Defendants Cargill, Inc. and Cargill Meat Solutions are collectively referred to as "Cargill."

44.      Cooper Farms, Inc. is a privately held Ohio corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Cooper Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey

in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

45.     Farbest Foods, Inc. is a privately held Indiana corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Farbest and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

46.     Foster Farms LLC is a privately held California corporation headquartered in Modesto, California. During the Class Period, Foster Farms LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

47.     Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California. Foster Poultry Farms is a related entity of Foster Farms LLC. During the Class Period, Foster Poultry Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of turkey, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

48.     Defendants Foster Farms LLC and Foster Poultry Farms are collectively referred to as "Foster Farms."

49.     Kraft Heinz Foods Company (Kraft Heinz), an Illinois corporation with headquarters in Pittsburgh, Pennsylvania, and Chicago, Illinois, is engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Kraft Heinz and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey

in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

50.     Kraft Foods Group Brands LLC is an Illinois corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Kraft Heinz and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

51.     Defendants Kraft Heinz Foods Company and Kraft Foods Brands LLC are collectively referred to as "Kraft Foods."

52.     Hormel Foods Corporation is a Delaware corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

53.     Hormel Foods LLC is a limited liability corporation headquartered in Austin, Minnesota. It is a wholly owned subsidiary of Hormel Foods Corporation. Hormel is engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Hormel Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

54.     House of Raeford Farms, Inc. is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina. During the Class Period, House of Raeford operated in part through a division referred to as "Columbia Farms," which is a group of broiler facilities

and operations originally named Columbia Farms, Inc. and Columbia Farms of Georgia, Inc. when purchased by House of Raeford in 1998. During the Class Period, House of Raeford Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

55.     Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland. During the Class Period, Perdue Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

56.     Perdue Foods LLC is a privately held Maryland limited liability company headquartered in Salisbury, Maryland. Perdue Foods LLC is a subsidiary of Perdue Farms, Inc. During the Class Period, Perdue Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

57.     Defendants Perdue Farms, Inc. and Perdue Foods LLC are collectively referred to as "Perdue."

58.     Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. It wholly owns and controls two subsidiaries, Tyson Prepared Foods, Inc. and Tyson Fresh Meats Inc. that slaughter and sell turkey products. During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

59.     Tyson Fresh Meats Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Fresh Meats and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

60.     Tyson Prepared Foods, Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

61.     The Hillshire Brands Company (Hillshire Brands) is a Maryland corporation headquartered in Chicago, Illinois. Hillshire Brands operates as a subsidiary of Tyson Foods that sells turkey products. During the Class Period, Hillshire Brands and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

62.     Defendants Tyson Foods, Inc., Tyson Fresh Meats, Inc., Tyson Prepared Foods, Inc., and Hillshire Brands are collectively referred to as "Tyson."

## C.     Co-Conspirators

63.     Co-Conspirator Circle S-Ranch, Inc. is a North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Circle S-Ranch and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

64.     Co-Conspirator Prestage Farms is a North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class

19

Period, Prestage Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

65.     Co-Conspirator West Liberty Foods LLC (West Liberty) is an Iowa corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, West Liberty and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

## IV.     FACTUAL ALLEGATIONS

66.     Starting no later than January 1, 2010, and continuing at least until January 1, 2017, defendants entered into an agreement to exchange information regarding their production and sale of turkey through Agri Stats. The information exchange through Agri Stats provided defendants an opportunity to obtain and monitor critical and competitively sensitive business information regarding each other's production and sales. The information exchange through Agri Stats had anticompetitive effects, as prices for turkey soared and defendants engaged in an industry-wide series of production cuts during the period. Notably, the information exchanged through Agri Stats was not available to purchasers of turkey, ensuring that the information exchange would not have procompetitive effects.

**A.     Agri Stats' information exchange services began in the broiler industry, where it has been used to facilitate widespread collusion.**

67.     Agri Stats has played a central role in other industries, including collusion in the broiler industry.[6] As alleged in the *In re Broiler Chicken Antitrust Litigation*, No. 16-cv-08637

---

[6] Broilers are chickens raised to be slaughtered before the age of 13 weeks.

(N.D. Ill.) litigation, the broiler producers used Agri Stats as a part of their conspiracy to restrain production and inflate prices.

68.     In the broiler industry, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, sales data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain line-by-line entries for plants, lines, and yields of various broiler facilities. Agri Stats relied upon (and the co-conspirators agreed to) a detailed audit process to verify the accuracy of data from each broiler producer's complex, sometimes directly contacting the broiler defendants to verify the data. Agri Stats also provided detailed price reports to the broiler industry through its subsidiary, Express Markets, Inc. or EMI. Agri Stats collected data from the broiler producers on a weekly basis and provided its reports to broiler producers on a weekly and monthly basis.

69.     The detail of these reports ensured that competitors could quickly decode the information of their purported competitors. The *Broiler* complaints allege it was common knowledge among producers that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual broiler complexes. The broiler reports, in part, contained so few producers participating that the identities were obvious. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger broiler defendants such as Tyson. The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.

70.     In the broiler industry, it is also alleged that Agri Stats – known to its co-conspirators to be a willing and informed conduit for illicit information exchanges – used public and semi-public forums to convey messages to industry participants that furthered the purposes of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing them to continue to act in concert to ensure they did. Agri Stats' own statements in the broiler industry facilitated the implementation of the agreement to restrict supply – where Agri Stats would transmit the intentions of the broiler producers to restrict supply.

71.     In a February 15, 2017 Bloomberg article relating to Agri Stats' roles in the broiler industry, it was reported:

> "Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. "***That is what creates stability for a cartel***.""

72.     The district court noted, in denying the motions to dismiss in the *In re Broiler Chicken Antitrust Litigation* that given the nature of the Agri Stats reports, the defendants are in fact sharing future anticipated production information with one another, which suggests high antitrust concerns.[7]

---

[7] Memorandum Opinion and Order at 11, *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill. Nov. 20, 2017), ECF No. 541.

**B.** **Defendants entered into an agreement to exchange information through Agri Stats regarding their production and sales of turkey.**

73.     Each member of the conspiracy, including the integrator defendants and co-conspirators, were all Agri Stats subscribers. Agri Stats publicly stated that 95% of the turkey market used Agri Stats reports.

74.     Agri Stats collects participant financial and production data electronically each month. Internal auditors convert the data, prepare it for comparison and perform the monthly audits. Each company's financial data is reconciled to its general ledger to help ensure actual costs are reported. Raw numbers are used in Agri Stats' standardized calculations, so all company numbers are calculated the same way. CW2 stated that he was involved during the conspiracy period in the monthly transmission of cost data from Cooper Farms to Agri Stats.

75.     Participants in the scheme received monthly detailed reports and graphs that allow them to compare their performance, sales prices, and costs to other participants. Agri Stats issues separate reports in the turkey industry to the integrator defendants regarding live operations, processing, further reprocessing, feed costs, and sales.

76.     Agri Stats provided the integrator defendants with an unparalleled ability to share critical and proprietary information concerning key business metrics, such as sales, production levels and short and long-term production capacity.

77.     Perhaps most egregiously, Agri Stats provided monthly sales reports to defendants. One of Agri Stats' subsidiaries is Express Markets, Inc. (aka, "EMI").  On EMI's publicly available webpage Amanda Martin, an Express Markets economist states that Agri Stats "audited turkey and broiler sales and product mix data, and worked with processing and further reprocessing reports.'" On information and belief, the Agri Stats turkey sales reports contained sales data that was less than six weeks old.

78.     As detailed in a recently filed amended complaint in the *Pork Antitrust Litigation*, No. 18-cv-1776 (JRT/HB) (D. Minn. Jan. 15, 2020), ECF No. 431, Agri Stats allowed subscribers to its pork sales reports to compare their prices for individual products against the national average net price, and against the national top 25 percent average price. Notably, Agri Stats identified opportunities for the Pork Integrators to raise prices. For instance, for each product, Agri Stats specifically broke out the variance between the company's price and the national average price, as well as the economic impact of the variance. This allowed co-conspirators to see how much more they could charge if they charged either the national average price or the average of the top 25% national average price.

79.     Agri Stats provided similar services to the integrator defendants regarding their production and sale of turkey. According to CW1, Agri Stats ranked the integrator defendants in their reports based on the returns (i.e. prices) that the integrator defendants received.

80.     As detailed in the *Pork* and *Broilers* complaints, for each of its reports, Agri Stats identified the list of participants who were contributing data or information to the reports. CW1 confirmed that the reports Agri Stats prepared for the integrator defendants identified the participants that provided data for each report, which allowed defendants to understand which of their competitors were participating for each report. CW2 confirmed that the Agri Stats reports identified each of the turkey production facilities that were participating in the reports.

81.     One presentation from Agri Stats shows the level of detail provided to competitors regarding profits in the swine market. On information and belief, similar levels of detail were provided to defendants who received Agri Stats reports in the turkey market.

**Top 25% in Profit - Variances to Average Company - 2009-2007**

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |
| 35,001,089 Pigs Finished | | | | | | | | | | | | |
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |
| 30,785,319 Pigs finished | | | | | | | | | | | | |
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | 5 | | 3 | |
| 22,306,500 Pigs finished | | | | | | | | | | | | |

82.     The purpose of these reports was not to provide better prices to consumers or businesses or to lower the costs of production. Instead, the clear purpose was to improve the profitability of the co-conspirators. The particular Agri Stats report referenced above shows the ranking of each company in profitability and compares the company to its competitors by providing the variance from the average. The Agri Stats report actually circulated to competitors contained even further detail. This underlines that the purpose of these reports was not to allow consumers or businesses to save more money through lower prices and more efficient production – in fact, the opposite was true, the purpose was the profitability of the defendant companies and the impact was higher sales prices for consumers and businesses.

83.     Much of the information shared by Agri Stats and the co-conspirators was unnecessary to achieve any benefits for consumers or businesses. Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies.

25

84.     Agri Stats knew that it played a central role in facilitating this anticompetitive information exchange. One presentation from Agri Stats regarding the swine industry spoke directly on this point, pointing out to industry participants that they could not undertake such a detailed cost analysis between competitors without Agri Stats auditing and standardizing the data:

## Data Integrity

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



85.     Agri Stats stated that to ensure data contained in the reports was accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine *tolerance and outlier status and enforce*," they must "[h]ave an administrator to compile the data and enforce procedures," and most importantly, "*[e]ach participant has to commit*."

86.     According to CW1, Agri Stats gave live presentations to defendant integrators to explain to them how to use the reports that Agri Stats prepared on the turkey industry and how to

26

compare themselves against their competitors: during the presentations, Agri Stats said, "if you are number one priced out of 13, that meant the return was so much versus the other companies."

87.     It is the standard policy of Agri Stats that it will only grant access to Agri Stats reports to similarly situated companies that themselves share data with Agri Stats. This ensures that data from Agri Stats is only available to one side of the market – the integrator defendants. The other side of the market, purchasers of turkey, is not allowed to access the Agri Stats data, and thus cannot use Agri Stats data to negotiate lower prices. Thus, Agri Stats reports function as a one-way ratchet that can be used for anticompetitive purposes by defendants but not for procompetitive purposes by purchasers.

**C.     Defendants possess market power in the market for turkey and turkey is the type of product for which information exchange is particularly likely to have anticompetitive effects.**

**1.     Defendants have market power in the market for turkey.**

88.     One tool that courts use to assess the competitive effects of concerted action is defining a relevant market – the zone of competition among the agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). The case concerns the sale of turkey for meat consumption in the United States.

89.     There is a single market for turkey for meat consumption. Prices for turkey sold in the United States are quoted generally in disassembled parts, with adjustments for transportation, product form (i.e., degree of processing or added value), and packaging at the time of sale.

90.     The relevant geographic market is the United States.

2. **There are high barriers to entry in the market for turkey for meat consumption.**

91. The existence of high barriers to entry is one factor which makes markets susceptible to collusion. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel. High barriers to entry in the turkey processing market exist, precluding other entrants or would-be competitors from entering the market for turkeys raised for consumption.

92. During the Class Period and continuing today, substantial barriers impede entry into the turkey market. A new entrant into the market would face costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, equipment, energy, transportation. Distribution, infrastructure (aka "rolling stock"), skilled labor, experienced management, a skilled contract-farmer base in a specific geographic area, long-standing customer relationships, safety and quality assurance, and regulatory approvals relating to environmental, worker safety, and food safety issues.

93. The price of construction of a new integrated turkey processing complex is relatively high. For example, the cost for a current market participant, Virginia Poultry Growers Cooperative, to construct a new turkey processing in 2015 was $62 million.[8]

94. The turkey market has been subject to steadily increasing consolidation over the last several decades. In the 1970s, the turkey market was defined by competition among dozens

---

[8] *Virginia Poultry Growers Cooperative Plans Turkey Processing Facility in Hinton*, Virginia, Area Development (July 22, 2015), *available at* https://www.areadevelopment.com/newsItems/7-22-2015/virginia-poultry-growers-cooperative-processing-facility-hinton-virginia565489.shtml.

of companies that worked with independent farmers.[9] But now, just four corporations – Cargill,

Hormel, Butterball, and Farbest – produce more than half of the turkey in the United States.

95.     The turkey market also has high levels of vertical integration that constitute a

barrier to entry. The National Turkey Federation states that "turkey companies are vertically

integrated, meaning they control or contract for all phases of production."[10]

96.     For example, Butterball has over 175 farms that they own, as well as contracts

with numerous independent farmers. Jennie-O owns over 100 commercial growing farms.

Cargill owns around 700 farms. Farbest has more than 200 contract growers.

### 3.     The defendants have market power in the market for turkey for meat consumption.

97.     The integrator defendants possess market power in the market for turkey for

consumption. Defendants and their co-conspirators controlled an average of 77% of the market

from 2010-2018.

---

[9] Christopher Leonard, *That Turkey on Your Plate Could Use Some More Industry Competition*, The Washington Post (Nov. 22, 2013), *available at* https://www.washingtonpost.com/opinions/that-turkey-on-your-plate-could-use-some-more-industry-competition/2013/11/22/045fc470-5177-11e3-a7f0-b790929232e1_story.html.

[10] *Industry Structure*, National Turkey Federation, https://www.eatturkey.org/industry-structure/ (last visited Feb. 27, 2020).



**D.    The market for turkey is the type of market where the information exchanges orchestrated by Agri Stats are likely to harm competition.**

98.    Competition is likely to be harmed when competitors with market power in concentrated markets, such as the market at issue, directly exchange strategic information about current and forward-looking plans for prices and supply. The strategic information exchanged between the defendants was competitively sensitive and a material factor in negotiations. Price, capacity, supply and costs are crucial aspects of competition. When defendants that are competing for the same customers exchange their strategic plans, comfort replaces uncertainty and reduces incentives to lower price or compete on other aspects of sales of turkey.

99.    The information exchange took place in private settings and involved the exchange of confidential, non-public information.

100. The market for turkey is characterized by numerous attributes that mean the type of information exchange facilitated by Agri Stats are particularly likely to have anticompetitive effects. In particular, the market for turkey features relatively few sellers, a fungible product, price-based competition, inelastic demand, and a trend toward price uniformity.

**1. The turkey market features few sellers.**

101. The turkey market is concentrated, with relatively few sellers. The defendants and co-conspirators control approximately 80 percent of turkey production and processing. The presence of few companies supports the inference that a conspiracy to exchange information had the intended effect of restraining competition.

**2. Turkey is a fungible market.**

102. One of the distinct characteristics of the turkey industry is its fungibility, also known as the ability to be freely exchangeable or replaceable in whole or in part. Common sense indicates at Thanksgiving that a consumer or business can substitute a whole turkey produced by Butterball with a whole turkey produced by Cargill.

103. Indeed, the Agri Stats reports themselves show that turkey is fungible because they aggregate data across defendants for particular types of turkey products and allow defendants to compare detailed information on prices for the same fungible product. CW1 confirmed that the Agri Stats reports were organized by specific item of turkey product.

**3. The turkey market features price-based competition.**

104. Turkey is a commodity market that faces price-based competition.

### 4. Demand for turkey is relatively inelastic.

105. Price elasticity of demand (PED) is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price.[11] A PED value between 0 and -1 indicates there is inelastic demand for the good or service – i.e., a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded. The USDA has estimated that the average PED estimate for the turkey market is -0.58 – meaning the demand for turkey is inelastic. Indeed, most American consumers and restaurant customers eat turkey at Thanksgiving, not pork or chicken, illustrating that there is no substitute for one of the key demand drivers of turkey.

### 5. The turkey market features a trend towards price uniformity.

106. Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another. For example, whole turkey products are produced on a commercial scale and sold in supermarkets. Whole turkeys are virtually indistinguishable, with similar nutritional values, branding and packaging.

### E. Industry-wide production cuts during the Conspiracy Period were facilitated through the information exchange conducted through Agri Stats.

107. As demonstrated in the following chart, the turkey integrators acted in a concerted way to decrease turkey supply in 2009, 2013, 2014, and 2015. Overall, industry supply decreased significantly from 2009 to 2015, before rebounding in 2016. The information exchange through Agri Stats facilitated the ability of defendants to monitor total industry levels of supply.

---

[11] *See, e.g.*, Jeffrey M. Perloff, Microeconomics with Calculus, 28-31 (2d Ed.); Patrick L. Anderson, et al., *Price Elasticity of Demand* (Nov. 13, 1997), https://scholar.harvard.edu/files/alada/files/price_elasticity_of_demand_handout.pdf; Gadi Fibich, Arieh Gavious & Oded Lowengart, *The Dynamics of Price Elasticity of Demand in the Presence of Reference Price Effects*, 33 J. Academy Mktg. Science 66-78 (2005), *available at* http://www.math.tau.ac.il/~fibich/Manuscripts/elasticity_JAMS.pdf.

**Figure 1: U.S. Turkey Total Heads Slaughtered**



**F.** **Abnormal pricing during the Class Period demonstrates the anticompetitive effects of the exchange of turkey information conducted through the Agri Stats sales reports.**

108.    Beginning in 2010, the turkey industry showed abnormal price movements, *i.e.*, price increases for the average turkey whole price unexplained by increases in costs. All of these pricing measurements show a significant break between pricing prior to 2010 and pricing after 2010, supporting the plausibility of anticompetitive effects on the turkey market from the information exchange conducted through Agri Stats. Plaintiff has measured the various abnormal pricing movements in a number of ways, including: (i) the average turkey price, (ii) the turkey integrators' margin during the Class Period; (iii) the variation between feed and turkey prices before and during the Class Period; and (iv) a regression analysis that models the relationship between turkey prices and feed prices.

**1.     The average turkey wholesale price experienced an unprecedented increase beginning in 2009.**

109.    According to aggregate prices published by the USDA, the average wholesale price per pound for turkey hens was between $0.55 and $0.85 every year from 2000 to 2009,

before steadily increasing to $1.15 by 2016. Following initiation of the *Broilers* litigation, the price of turkey then quickly returned to the price at which it was prior to the conspiracy. The following graph shows the unprecedented increase in turkey prices beginning in 2009, and staying elevated through the end of 2016.

**Figure 2: Average Turkey Wholesale Prices in Cents per lbs., 2000-2018**



Average Yearly Wholesale Turkey Prices: Hens

2. **Beginning in 2009, defendants' revenues radically diverged from their costs.**

110.    Experts examined the spread between turkey revenue and turkey-related costs (costs of goods sold + operating costs) for Jennie-O Turkey, the only one of the three largest turkey integrator defendants with public earnings, as a proxy for measuring the spread between a defendant's price of wholesale turkey and their turkey costs.[12] This measurement accounts for defendant-specific operating costs. This analysis confirms the beginning of abnormal pricing in

---

[12] Hormel does not make any data publicly available on Jennie-O's costs. Therefore, it has been assumed for the purposes of this analysis that Jennie-O's costs are the same proportion to Hormel's overall costs as Jennie-O's revenues are to Hormel's overall revenues.

2009, where there was a divergence in revenue and costs beginning at the start of the Class Period in 2009.

111.    The following chart shows a break in revenues and costs around the start of the Class Period in 2010 for Hormel's Jennie-O turkey brand:

**Figure 3: Jennie-O's Revenues vs Costs, March 2001 to March 2018**



112.    The anticompetitive effect of defendants' information exchange is seen in the dramatic increase in Jennie-O Turkey's spread between revenue and costs after the start of the conspiracy period.

35

**Figure 4: Jennie-O Turkey's spread: Revenue minus Cost 2001-2018**



113.    These analyses of the spread between costs and prices confirm one essential fact –

that rising costs do not explain the increases in price seen during the Class Period.

> **3.    During the conspiracy period, prices rose but production failed to rise to match demand, indicating an anticompetitive restraint on supply in the market for turkey facilitated by the information exchange through Agri Stats.**

114.    In a competitive market, production generally matches demand. More demand

will lead to more supply. Conversely, a drop in production caused by falling demand should

correspond to falling prices. However, in the turkey market during the conspiracy period,

production, measured through USDA data, remained artificially restrained even as demand,

captured by higher per capita expenditures on turkey, rose significantly. These observed price

and output dynamics, shown in the below chart, are consistent with an anticompetitive effect on

turkey output facilitated by the information exchange through Agri Stats.



4.  **During the conspiracy period, prices of turkey radically diverged from the costs of underlying feed.**

115.    Feed is the primary driver of turkey costs, accounting for approximately 60-70% of the overall cost of raising turkeys for sale according to the New York Times.[13] Prior to the conspiracy period, there was a tight relationship between the price of feed and the price of turkey, as would be expected in a competitive commodity market that was pricing its product based on its primary input cost. However, during the conspiracy period, the relationship between the price of feed and the price of turkey diverged dramatically, as would be expected as an anticompetitive effect of the information exchange that allowed the integrator defendants to charge more than was justified by their input costs. The divergence is illustrated in the below chart:

---

[13] Paul Sullivan, *In the Labyrinth of Turkey Pricing, a Reason Under Every Giblet*, The New York Times (Nov. 18, 2011), *available at* https://www.nytimes.com/2011/11/19/your-money/a-primer-to-calculate-turkey-prices.html.



**5.      A regression model demonstrates the anticompetitive effects on the price of turkey caused by the information exchange conducted through Agri Stats.**

116.     To demonstrate the anticompetitive effects of defendants' information exchange on the market for turkey, experts have done a regression model based on the relationship between the price of turkey hens and the price of turkey feed, which is the primary input cost for turkeys. The formula of the regression is the following: $(HenPrice)=\alpha+\beta(FeedPrice)t+\varepsilon t$. As shown below, the regression shows a significant elevation in the prices of turkey during the conspiracy period, showing the effects of the information exchange through Agri Stats:



**G.     Defendants actively concealed the extent of their information exchange and plaintiff did not and could not have discovered defendants' anticompetitive conduct.**

117.     Plaintiff and the members of the Classes had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this complaint. Defendants engaged in a secret information exchange that did not reveal facts that would put plaintiff or the Classes on inquiry notice that there was an anticompetitive agreement to exchange information regarding the market for turkey. Throughout the Class Period, defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from plaintiff and class members.

118.     In 2009, the President of Agri Stats, Bryan Snyder, commented on how secretive the true nature of Agri Stats was when he stated:

Agri Stats has always been kind of a quiet company. ***There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background***, and really our specialty is working directly with companies about their opportunities and so forth.

119.    At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Mr. Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidential[] nature of the information."

120.    Not until recently was the extent of the information exchange conducted through Agri Stats widely known or reported. Only after the filing of a February 7, 2018 Second Consolidated and Amended Complaint by the End User Plaintiff Class in the *In re Broiler Chicken Antitrust Litigation*, Case No. 1:16-cv-08637 (N.D. Ill.), was there a comprehensive presentation of the full scope of the confidential services that Agri Stats provides to its clients in the broiler industry.

121.    The filing of that amended complaint collectively disclosed the likelihood that the turkey industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.

122.    Defendants concealed the extent of their information exchange through Agri Stats. Indeed, to this day, it is not publicly known the number of companies that receive Agri Stats reports regarding turkey. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of defendants' turkey prices before these recent events.

**H.      Defendants had numerous opportunities to collude.**

123.    Defendant integrators are members of several turkey-related trade associations and other forums, which they used to facilitate their conspiratorial conduct. Turkey producers have numerous regular events through which they can communicate in person with one another. Regular and frequent attendance by defendants' CEOs and top-level executives at trade-association meetings is the norm rather than the exception.

124.    Nearly every defendant integrator's CEO has representatives on the board of directors or executive committee of these trade associations.

125.    The National Turkey Federation is a national advocate for turkey farmers and processors; members include growers, processors, hatchers, breeders, distributors, allied services, and state associations. High-ranking executives of Butterball, Jennie-O Turkey Store (Hormel), Cargill, Tyson, Farbest, and Perdue currently serve as officers or on the executive committee; and nearly all of the defendants have membership in this trade association. In addition to regular board and executive committee meetings, the federation holds an annual convention in February and an annual leadership conference in July where these executives gather and discuss turkey-related information.

126.    Upon information and belief, the top-level executives from defendants discuss topics with one another relating to pricing, production, and other non-public proprietary information outside of the National Turkey Federation's formal meetings. These regular, informal, and in-person opportunities to discuss pricing and production in the turkey industry gives CEOs and top-level executives comfort that their competitors remain committed to a plan to artificially restrict turkey production.

127.    The United States Poultry & Egg Export Council (USAPEEC) has its home office in Stone Mountain, Georgia. Defendants are all members of the council. USAPEEC has a

network of international offices and consultants in key export markets. The mission of USAPEEC is to promote exports of U.S. poultry and eggs around the world. The council has evolved into an advocate for the industry on trade-policy issues. USAPEEC has about 200 member companies and organizations. The council holds Board of Directors meetings quarterly and includes executives from all or nearly all defendants.

128. The U.S. Poultry & Egg Association (U.S. Poultry) describes itself as the world's largest and most active poultry organization. U.S. Poultry's members include producers and processors of broilers, turkeys, ducks, eggs, and breeding stock, as well as allied companies. Many of the defendants are members of U.S. Poultry. U.S. Poultry holds regular Board of Directors meetings each quarter during January, March, June, and each fall. Butterball, Cargill, Foster, Tyson, and Perdue have representation on the Board of Directors.

129. The North American Meat Institute (NAMI) represents companies that process 95% of red meat and 70% of turkey products in the United States and their suppliers throughout the country. NAMI hosts the Meat Industry Summit in April each year. Additionally, it holds regular Board of Director meetings. Butterball, Cargill, Hormel, and Tyson have representation on the NAMI Board.

## V. CLASS ACTION ALLEGATIONS

130. Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All commercial and institutional purchasers in the United States and its territories that purchased turkey, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of turkey, from January 1, 2010 to January 1, 2017. Excluded from the Nationwide Class are the Court and its personnel, and any Defendants and their parent or subsidiary companies.

131.    Plaintiff also brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "Indirect Purchaser States")[14]  on behalf of the following class (the "Damages Class"):

> All commercial and institutional purchasers in the Indirect Purchaser States that purchased turkey, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of turkey from January 1, 2010 to January 1, 2017. Excluded from the Damages Class are the Court and its personnel, and any Defendants and their parent or subsidiary companies.

132.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

133.    Plaintiff reserves the right to modify the class definitions at a later date.

134.    While Plaintiff does not know the exact number of the members of the Classes, there are likely thousands of class members.

135.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

---

[14] The Indirect Purchaser States include the following states (and territory):  Arizona, Arkansas, California, District of Columbia, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

(a)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of turkey in the United States;

(b)     Whether Defendants and their co-conspirators participated in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements that they reached;

(c)     The identity of the participants of the alleged conspiracy;

(d)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(e)     Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(f)     Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(g)     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(h)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Classes;

(i)     The effect of the alleged conspiracy on the prices of turkey sold in the United States during the Class Period;

(j)     Whether the Defendants and their co-conspirators actively concealed, suppressed, and failed to disclose material facts to Plaintiff and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for turkey, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiff and the other members of the Classes;

(k)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(l)     The appropriate class-wide measure of damages for the Damages Class.

136.    Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for turkey purchased indirectly. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

137.    Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

138.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

139.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Plaintiff reserves the discretion to certify the Damages Class as separate classes for each of the Indirect Purchaser States or as separate classes for certain groups of Indirect Purchaser States, should the Court's subsequent decisions in this case render that approach more efficient.

140.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VI.     ANTITRUST INJURY

141.     Defendants' anticompetitive conduct had the following effects, among others:

A.     Price competition has been restrained or eliminated with respect to turkey;

B.     The prices of turkey have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C.     Commercial and institutional indirect purchasers of turkey have been deprived of free and open competition; and

D.     Commercial and institutional indirect purchasers of turkey, including plaintiff, paid artificially inflated prices.

142.    Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge paid by the commercial and institutional indirect purchasers. Thus, the economic harm to plaintiff and the class members can be quantified.

143.    The purpose of the conspiratorial conduct of defendants and their co-conspirators was to raise, fix, or maintain the price of turkey and, as a direct and foreseeable result, plaintiff and the Class paid supra-competitive prices for turkey during the Class Period.

144.    By reason of the alleged violations of the antitrust laws, plaintiff and the Class have sustained injury to their businesses or property, having paid higher prices for turkey than they would have paid in the absence of defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

145.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII.    CAUSES OF ACTION

### COUNT I

### Violation of Section 1 of the Sherman Act (15 U.S.C. §§ 1, 3) (Conspiracy in Restraint of Trade)

146.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

147.    Beginning at a time currently unknown to plaintiff, but at least as early as January 1, 2010, and continuing at least until January 1, 2017, the exact dates being unknown to plaintiff, defendants and their co-conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations. This

agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

148.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of defendants' affairs.

149.    Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for turkey throughout the United States.

150.    The relevant product market is turkey and the relevant geographic market is the continental United States.

151.    Defendant integrators possess market power in the Relevant Market. Defendant integrators and their co-conspirators controlled approximately 80 percent of the Relevant Market. Defendant integrators' collective market power includes the power to artificially deflate the amount of turkey produced in the United States below competitive levels and to artificially inflate the price plaintiff pays for turkey above competitive levels.

152.    Defendants could impose an increase in the price of turkey collectively without causing many consumers and businesses to switch their purchases to another product. Turkey constitutes a unique product market.

153.    Defendants view the turkey products as fungible. Turkey products are generally interchangeable, permitting defendant integrators to readily to compare and match each other's pricing.

154.    The information regularly exchanged by defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public information about current supply,

production and pricing plans regarding turkey. The information exchanges specifically included the exchange through Agri Stats of weekly and monthly reports regarding defendants' turkey operations, including weekly sales data that allowed defendants to compare their prices with their competitors and raise prices that were lower.

155.    Defendants' regular information exchanges through Agri Stats reflected concerted action between horizontal competitors in the market for turkey.

156.    Each defendant integrator furnished competitively sensitive information to other defendant integrators with the understanding that it would be reciprocated. Agri Stats enforced this understanding by requiring defendants to share data in order to receive comparable data.

157.    The agreement to regularly exchange detailed and non-public information about current production, supply, and pricing suppressed competition between the defendants. Agri Stats specifically identified for defendants the instances where their pricing was lower than other defendants and where they could raise their prices to match.

158.    When defendants that are competing for the same consumers and businesses exchange competitive information, it reduces the incentives to compete on price. Accordingly, defendants used the data obtained through Agri Stats to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the turkey market. This strategic information was a material factor in defendant integrators' decisions to inflate the prices that plaintiff paid for turkey during the Class Period.

159.    Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purpose. The information exchanged between defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

160.     The information-exchange agreement has had the effect of (1) reducing and suppressing competition among defendants in the market for turkey in the United States and (2) inflating the prices of turkey during the Class Period.

161.     As a result of defendants' unlawful conduct, plaintiff and the members of the Class have been harmed by being forced to pay inflated, supracompetitive prices for turkey.

162.     As a direct and proximate result of defendants' anticompetitive conduct, plaintiff and members of the Nationwide Class have been injured in their business or property and will continue to be injured in their business and property by paying more for turkey than they would have paid and will pay in the absence of the conspiracy.

163.     The alleged contract, combination, or conspiracy is also a *per se* violation of the federal antitrust laws.

164.     Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

### COUNT II

### <u>Violation of State Antitrust Statutes</u><br><u>(on behalf of Plaintiff and the Damages Class)</u>

165.     Plaintiff repeats the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

166.     During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of turkey in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

167.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for turkey, including in the United States and its territories.

168.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including agreeing to fix, increase, inflate, maintain, or stabilize effective prices of turkey purchased by Plaintiff and members of the Damages Class; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

169.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of turkey. As a direct and proximate result, Plaintiff and members of the Damages Class were deprived of free and open competition and paid more for turkey than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

170.    In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiff and the members of the Damages Class.

171.    Accordingly, Plaintiff and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

172.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations of the following state antitrust statutes.

173.    **Arizona:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Ariz. Rev. Stat. §44-1401, *et seq*.  Defendants' conspiracies had the following effects: (1) price competition for turkey was restrained, suppressed, and eliminated throughout Arizona; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §44-1401, *et seq*.

174.    **California:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code §16700, *et seq*.  During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code §16720.  Each defendant has acted in violation of Cal. Bus. & Prof. Code §16720 to fix, raise, stabilize, and maintain prices of turkey at supracompetitive levels.  The violations of Cal. Bus. & Prof. Code §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of turkey.  For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of turkey.  The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for turkey has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for

52

turkey provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased turkey indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a result of Defendants' violation of Cal. Bus. & Prof. Code §16720, Plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code §16750(a).

175. **District of Columbia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code §28-4501, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and purchased turkey in the District of Columbia, paid supracompetitive, artificially inflated prices for turkey, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D.C. Code §28-4501, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under D.C. Code §28-4501, *et seq*.

176. **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §553.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Iowa; (2) turkey prices were raised, fixed, maintained and stabilized at artificially

high levels throughout Iowa.  During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §553.1, *et seq*.  Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code §553.1, *et seq*.

177.  **Kansas:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. §50-101, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Kansas; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas.  During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.  Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kan. Stat. §50-101, *et seq*.

178.  **Maine:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101.  Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Maine; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine.  During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, § 1104.

179.  **Michigan:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws §445.771, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Michigan; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan.  During the Class Period, Defendants'

illegal conduct substantially affected Michigan commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mich. Comp. Laws §445.771, *et seq*.

180.    **Minnesota:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. §325D.49, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minn. Stat. §325D.49, *et seq*.

181.    **Mississippi:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code §75-21-1, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Miss. Code §75-21-1, *et seq*.

182.    **Nebraska:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. §59-801, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska.  During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Neb. Rev. Stat. §59-801, *et seq.*

183. **Nevada:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. §598A.010, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Nevada; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nev. Rev. Stat. Ann. §598A.010, *et seq*.

184. **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Ann. §356:1. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §356:1, *et seq*.

185. **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Statutes Annotated § 57-1-1, *et seq*.

186.    **New York:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws § 340, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout New York; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. The conduct set forth above is a per se violation of the Donnelly Act, § 340, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under New York General Business Laws § 340, *et seq.*

187.    **North Carolina:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes § 75-1, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina General Statutes § 75-16, *et seq.*

188.    **North Dakota:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code §51-08.1-01, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota.  During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. Accordingly,

Plaintiff and members of the Damages Class seek all relief available under N.D. Cent. Code §51-08.1-01, *et seq.*

189.     **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. § 646.725, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed and eliminated throughout Oregon; (2) turkey prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Or. Rev. Stat. § 646.780, *et seq.*

190.     **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-4, *et seq.* The Rhode Island statutes allow actions on behalf of indirect purchasers for conduct during the Class Period. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-11, *et seq.*

191.     **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. During the

Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws § 37-1-3.1, *et seq.*

192. **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. §47-25-101, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tenn. Code Ann. §47-25-101, *et seq.*

193. **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Utah; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

194. **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vermont Stat. Ann. § 2453, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Vermont; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants'

illegal conduct had a substantial effect on Vermont commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under 9 V.S.A. § 2465, *et seq.*

195.    **West Virginia:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-3, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code § 47-18-9, *et seq*.

196.    **Wisconsin:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. §133.01, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wis. Stat. §133.01, *et seq*.

## COUNT III

### Violation of State Consumer Protection Statutes
### (on Behalf of Plaintiff and the Damages Class)

197.     Plaintiff repeats the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

198.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

199.     **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of Ark. Code Ann. §4-88-101, *et seq*.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which turkey was sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiff and members of the Damages Class.  The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10).  Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10) and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

200.    **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Cal. Bus. & Prof. Code §17200, *et seq.*  During the Class Period, Defendants manufactured, marketed, sold, or distributed turkey in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code §17200, *et seq.*, by engaging in the acts and practices specified above.  This claim is instituted pursuant to Cal. Bus. & Prof. Code §§17203 and 17204, to obtain restitution from these Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code §17200, commonly known as the Unfair Competition Law.  Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code §17200.  The acts, omissions, misrepresentations, practices and nondisclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code §17200, *et seq.*, including, but not limited to, the following: (1) the violations of §1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code §16720, *et seq.*, set forth above.  Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Cal. Bus. & Prof. Code §16720, *et seq.*, and whether or not concerted or independent acts, are otherwise unfair, unconscionable unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of turkey in the State of California within the meaning of Cal. Bus. & Prof. Code §17200 *et. seq.*; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code §17200, *et seq.*  Plaintiff and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business acts or practices.  The illegal conduct alleged

herein is continuing and there is no indication that Defendants will not continue such activity into the future.  The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiff and the members of the Damages Class to pay supracompetitive and artificially inflated prices for turkey.  Plaintiff and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.  The conduct of Defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code §17200, *et seq*.  As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.  Plaintiff and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§17203 and 17204.

201.  **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq*.  Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Florida; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Accordingly, plaintiff and members of the Damages Class seek all relief available under Fla. Stat. §501.201, *et seq*.

202.  **Minnesota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*. Defendants engaged in unfair and deceptive

63

trade practices during the course of their business dealings, which significantly impacted

Plaintiff as a purchaser of the Defendants' goods, and which caused Plaintiff to suffer injury.

Defendants took efforts to conceal their agreements from Plaintiff and the members of the

Damages Class. Defendants' unlawful conduct had the following effects: (1) turkey price

competition was restrained, suppressed, and eliminated throughout Minnesota; (2) turkey prices

were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota.

During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce

and turkey purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiff and

members of the Damages Class seek all relief available under that statute and as equity demands.

203. **Missouri:** Defendants have engaged in unfair competition or unlawful, unfair,

unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising

Practices Act, Mo. Rev. Stat. § 407.010, *et seq*. Defendants engaged in the conduct described in

this Class Action Complaint in connection with the sale of products containing turkey in

Missouri. During the Class Period, Defendants' illegal conduct substantially affected Missouri

commerce and consumers. Defendants agreed to, and in fact did, fix, control, and maintain at

artificial and non-competitive levels, the price at which turkey was sold, distributed, or obtained

in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and

state law, violated public policy, was unethical, oppressive, and unscrupulous, and caused

substantial injury to Plaintiff and the members of the Damages Class. Defendants concealed,

suppressed, and failed to disclose material facts to Plaintiff and the members of the Damages

Class concerning Defendants' unlawful activities and artificially inflated prices for turkey. The

concealed, suppressed, and omitted facts would have been important to Plaintiff and the

members of the Damages Class as they related to the cost of products containing turkey. Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Missouri; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiff and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and the members of the Damages Class paid supracompetitive, artificially inflated prices for products containing turkey. The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiff and the members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and the members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce," as further interpreted by the Missouri Code of State Regulations, which provides for the relief sought in this Count.

204. **Nebraska**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*. Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold, or distributed turkey in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and turkey

purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

205.     **New Hampshire**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq*. Defendants sold turkey in New Hampshire and deceived Plaintiff and Class Members in New Hampshire into believing that the turkey were competitively priced. Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff and members of the Damages Class, who resided in New Hampshire and/or purchased the turkey in New Hampshire were deprived of free and open competition in New Hampshire; and (4) Plaintiff and members of the Damages Class, who resided in New Hampshire and/or purchased turkey in New Hampshire paid supracompetitive, artificially inflated prices for turkey in New Hampshire. During the Class Period, Defendants marketed, sold, or distributed turkey in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and turkey purchasers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

206.     **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*

In New Mexico, price-fixing is actionable as an "unconscionable trade practice" under N.M. Stat. § 57-12-2(E) because it "takes advantage of the lack of knowledge … of a person to a grossly unfair degree" and also results in a "gross disparity between the value received by a person and the price paid." Defendants had the sole power to set that price, and Plaintiff and members of the Damages Class had no meaningful ability to negotiate a lower price from wholesalers. Moreover, Plaintiff and members of the Damages Class lacked any meaningful choice in purchasing turkey because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of turkey, including their illegal conspiracy to secretly fix the price of turkey at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff and members of the Damages Class. Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed and eliminated throughout New Mexico; (2) turkey prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for turkey.  During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1,

*et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

207. **New York:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which turkey were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of turkey that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for turkey; and Defendants alone possessed material information that was relevant to consumers and businesses, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased turkey were misled to believe that they were paying a fair price for turkey or the price increases for turkey were for valid business reasons; and similarly situated consumers and businesses were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing turkey would have an impact on New York consumers and businesses and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing turkey would have a broad impact, causing commercial and institutional indirect purchaser class members who indirectly purchased turkey to be injured by paying more for turkey than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in

consumer injury and broad adverse impact on the public at large, and harmed the public interest

of customers and commercial and institutional indirect purchasers in New York State in an

honest marketplace in which economic activity is conducted in a competitive manner.

Defendants' unlawful conduct had the following effects: (1) turkey price competition was

restrained, suppressed, and eliminated throughout New York; (2) turkey prices were raised,

fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff

and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff

and members of the Damages Class paid supracompetitive, artificially inflated prices for turkey.

During the Class Period, Defendants marketed, sold, or distributed turkey in New York, and

Defendants' illegal conduct substantially affected New York commerce and consumers. During

the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates

they dominated and controlled, manufactured, sold and/or distributed turkey in New York.

Plaintiff and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus.

Law § 349(h).

208.    **North Carolina:** Defendants have engaged in unfair competition or unfair,

unconscionable, or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1, *et seq*.

Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing,

controlling and/or maintaining, at artificial and non-competitive levels, the prices at which turkey

were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements

from Plaintiff and members of the Damages Class.  Defendants' price-fixing conspiracy could

not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts.

Secrecy was integral to the formation, implementation and maintenance of Defendants' price-

fixing conspiracy.  Defendants committed inherently deceptive and self-concealing actions, of

which Plaintiff could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and injury to commercial and institutional indirect purchasers along with broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers and commercial and institutional indirect purchasers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed and eliminated throughout North Carolina; (2) turkey prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for turkey. During the Class Period, Defendants marketed, sold, or distributed turkey in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed turkey in North Carolina. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

209. **North Dakota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or

70

Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which turkey was sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for turkey. Defendants misrepresented to all purchasers during the Class Period that Defendants' turkey prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for turkey was restrained, suppressed, and eliminated throughout North Dakota; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and turkey purchasers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of turkey, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing turkey at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

210. **Rhode Island:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade

Practice and Consumer Protection Act (R.I. Gen. Laws § 6-13.1-1, *et seq.*) Members of the Damages Class purchased turkey for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which turkey were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for turkey. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' turkey prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for turkey. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers, including commercial and institutional indirect purchasers that serve as a conduit to consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of turkey, likely misled all purchasers

acting reasonably under the circumstances to believe that they were purchasing turkey at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of turkey they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

211. **South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §39-5-10 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed and eliminated throughout South Carolina; (2) turkey prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §39-5-10 *et seq*., and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

212. **South Dakota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting,

fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which turkey was sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for turkey. Defendants misrepresented to all purchasers during the Class Period that Defendants' turkey prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for turkey was restrained, suppressed, and eliminated throughout South Dakota; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota commerce and on those who purchased turkey in South Dakota. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of turkey, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing turkey at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of turkey they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

213. **Vermont:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Stat. Ann. § 2451, *et*

*seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which turkey were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for turkey. Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' turkey prices were competitive and fair. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of turkey, likely misled all commercial and institutional indirect purchasers acting reasonably under the circumstances to believe that they were purchasing turkey at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

214. **Wisconsin**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or

maintaining, at artificial and non-competitive levels, the prices at which turkey was sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' turkey prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for the turkey was restrained, suppressed, and eliminated throughout Wisconsin; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and purchasers of turkey. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of turkey at issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing turkey at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiff and members of the Damages Class as they related to the cost of turkey they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

## COUNT IV

## Unjust Enrichment[15]
## (on behalf of Plaintiff and the Damages Class)

---

[15] Unjust enrichment claims are alleged herein under the laws of the states for which claims are alleged in Counts Two and Three above.

215.    Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

216.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

217.    Defendants have unlawfully benefited from their sales of turkey because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged privately held commercial and institutional indirect purchasers, which purchased turkey at prices that were more than they would have been but for Defendants' unlawful actions.

218.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiff and members of the Damages Class.

219.    Plaintiff and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and the Damages Class.

220.    Defendants have been enriched by revenue resulting from unlawful overcharges for turkey while Plaintiff and members of the Damages Class has been impoverished by the overcharges they paid for turkey imposed through Defendants' unlawful conduct.  Defendants' enrichment and the impoverishment of Plaintiff and members of the Damages Class are connected.

221.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiff and the Damages Class, because Plaintiff and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

222.     Plaintiff did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

223.     The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of turkey.

224.     The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of turkey are ascertainable by review of sales records.

225.     It would be futile for Plaintiff and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiff and the Damages Class with respect to Defendants' sales of turkey.

226.     It would be futile for Plaintiff and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased turkey, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiff and the Damages Class for Defendants' unlawful conduct.

227.     The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for turkey is a direct and proximate result of Defendants' unlawful practices.

228.     The financial benefits derived by Defendants rightfully belong to Plaintiff and the Damages Class, because Plaintiff and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

229.     It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except California, Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for turkey derived from Defendants' unlawful, unfair, and unconscionable methods, acts, and trade practices alleged in this Complaint.

230.     Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff and the Damages Class.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as turkey prices remain inflated above pre-conspiracy levels.

231.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Damages Class all unlawful or inequitable proceeds they received from their sales of turkey.

232.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of turkey by Plaintiff and the Damages Class. Plaintiff and the Damages Class have no adequate remedy at law.

## VIII.   REQUEST FOR RELIEF

WHEREFORE, plaintiff, on behalf of itself and the Class of all others so similarly situated, respectfully requests judgment against defendants as follows:

233.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint plaintiff as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

234.     The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the

Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; or, alternatively, (d) acts of unjust enrichment by Defendants as set forth herein.

235.    Plaintiff and the Class recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgments in favor of plaintiff and the members of the Damages Class be entered against defendants in an amount to be trebled to the extent such laws permit;

236.    Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

237.    Plaintiff and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the Damages Class may make claims on a *pro rata* basis;

238.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

239.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

240.    Plaintiff and the members of the Damages Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

241.    Plaintiff and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

242.    Plaintiff and the members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## IX.    JURY TRIAL DEMANDED

243.    Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated:  April 13, 2020

Respectfully submitted,

**CLIFFORD LAW OFFICES PC**

By:  _/s/  Shannon M. McNulty_
Robert A. Clifford
Shannon M. McNulty
120 N. LaSalle Street, Suite 3100
Chicago, IL 60602
rac@cliffordlaw.com
smm@cliffordlaw.com
Telephone:  (312) 899-9090

Jonathan W. Cuneo (to apply _pro hac vice_)
Joel Davidow (to apply _pro hac vice_)
Daniel Cohen (to apply _pro hac vice_)
Blaine Finley (to apply _pro hac vice_)
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave., NW
Suite 200
Washington, DC 20016
Telephone:  (202) 789-3960
Email:  jonc@cuneolaw.com
Email:  joel@cuneolaw.com
Email:  danielc@cuneolaw.com
Email:  bfinley@cuneolaw.com

_Counsel for Plaintiff and the Proposed Classes_